2025 Tex. Bus. Ct. 24



The Business Court of Texas
Eighth Division

| | | |
|---|---|---|
| BLACK MOUNTAIN SWD, LP, | § § § § § § § § § § § § § | |
| *Plaintiff*, | | |
| v. | | Cause No. 25-BC08A-0004 |
| NGL WATER SOLUTIONS PERMIAN, LLC, | | |
| *Defendant*. | | |

## OPINION AND ORDER

### *Syllabus*[*]

 *The Court lacks jurisdiction under Section 25A.004(d)(1) because the amount in controversy does not exceed $10 million. The amount in controversy is the actual damages sought by Plaintiff for unpaid royalties on saltwater transported in pipelines subject to the royalty agreement from the date the agreement was signed to the date the action was filed. The uncontroverted evidence establishes that unpaid royalties on the total volume of saltwater transported in these pipelines during this period would not exceed $4.5 million. The amount in controversy does not include the value of the purported right at stake to receive disputed royalties on discarded saltwater for the life of the agreement, as urged by Defendant.*

---

[*] NOTE: The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.

**OPINION**

[¶ 1] This action was filed in the district court on February 10, 2025, and removed without agreement to the Business Court ("Court") by Defendant NGL Water Solutions Permian LLC ("NGL Permian") on March 11, 2025. Pending before the Court is Plaintiff Black Mountain SWD LP's ("Black Mountain") Motion to Remand ("Motion") filed on April 10, 2025, and heard on May 28, 2025. Black Mountain seeks remand, arguing that the Court does not have jurisdiction under Section 25A.004(d)(1) of the Texas Government Code because the amount in controversy does not exceed $10 million. Motion at 4, 7-8. After considering the parties' arguments, written and oral, and the relevant law, the Court concludes that, because the amount in controversy does not exceed $10 million, the Motion should be **GRANTED**.

**I. BACKGROUND**

**A. The parties and their contractual relationship**

[¶ 2] Black Mountain and NGL Permian serve the oil and gas industry. In this action, their business relationship is governed by one agreement signed by them, a royalty agreement ("RA") executed pursuant to a purchase and sale agreement ("PSA"). The PSA, which was signed by Black Mountain, as a member of the selling party, and NGL Permian's corporate parent—NGL Water Solutions, LLC ("NGL")—as the purchaser, is not germane in resolving the current dispute between the parties.[1] Notice of Removal ("Notice") Exh. A.

---

[1] According to NGL Permian's Corporate Disclosure Statement filed with the Court, NGL is NGL Permian's parent company. Although NGL Permian did not sign the PSA, the PSA permits NGL to assign or

[¶ 3] The RA, dated January 11, 2019, was executed by Black Mountain and NGL Permian in substantially the form of the royalty agreement attached to the PSA, albeit with NGL Permian substituted for NGL. Notice Exh. B. Like the form royalty agreement attached to the PSA, the RA grants a $0.03-per-barrel royalty to Black Mountain for product transported through the pipelines covered by the RA. Notice Exh. B. But the royalty is payable only on those volumes of product for which NGL Permian receives a transportation fee from a third-party not affiliated with NGL Permian. Notice Exh. B. The royalty is not payable for saltwater transported as a result of capacity balancing across current and future saltwater disposal assets. Notice Exh. B. And like the form royalty agreement attached to the PSA, the RA requires accounting and auditing for Black Mountain's benefit upon first payment of the royalty and quarterly thereafter and, if necessary, reimbursement to Black Mountain for underpayment of royalties. Notice Exh. B.

## B. The dispute and Black Mountain's ensuing lawsuit

[¶ 4] After NGL Permian stopped paying royalties at some unidentified point, Black Mountain learned of facts leading Black Mountain to believe that NGL Permian was

---

transfer its rights and obligations under the PSA to an affiliate, a term defined in the PSA to include an entity controlled by NGL. Notice Exh. A (section 8.5; definitions of affiliate and person). Pursuant to the PSA, NGL purchased the assets and leases of an existing business providing wastewater services in Reeves County, Texas, for $14.5 million. Notice Exh. A; Defendant's Opposition to Plaintiff's Motion to Remand ("Response"), at 6-7. As a condition of, and in partial consideration for, consummating the PSA, Black Mountain and NGL were obligated to undertake certain reciprocal acts. Black Mountain was obligated to obtain leases from the Texas Department of Transportation ("TxDOT") allowing NGL to construct improvements along a right-of-way as described in the PSA. Notice Exh. A; Response, at 7. NGL was obligated to sign a TxDOT royalty agreement with Black Mountain, in substantially the form of the royalty agreement attached to the PSA, granting Black Mountain a $0.03-per-barrel royalty. Notice Exh. A; Response, at 7.

mislabeling the transportation of saltwater and its associated fee to avoid paying royalties. 1st Amend. Pet. ¶ 9; Motion Exh. A. Black Mountain learned that NGL Permian had been charging some third parties a disposal fee, not a transportation fee, for moving saltwater from well sites to an injection well. 1st Amend. Pet. ¶ 10; Motion Exh. A. Black Mountain also learned from an accounting requested from NGL Permian that NGL Permian had: (1) categorized the transportation of 144,404,830 barrels of saltwater during the period between January 11, 2019, and December 31, 2024, as "capacity balancing"; and (2) paid the $0.03-per-barrel royalty on only 22,102 of these barrels. 1st Amend. Pet. ¶ 11; Motion Exh. A.

[¶ 5] Proceeding on the basis that NGL Permian had underpaid royalties, Black Mountain sued NGL Permian for breach of contract in the 342nd Judicial District Court of Tarrant County, Texas, on February 10, 2025. In its first amended petition filed on March 10, 2025, Black Mountain alleges that NGL Permian breached the RA by failing to pay royalties on substantial volumes of saltwater transported for third parties unaffiliated with NGL Permian through the pipelines subject to the RA. 1st Amend. Pet. ¶¶ 12-14. Black Mountain seeks—as it did in its original petition—actual damages of more than $1 million on its breach-of-contract claim, pre- and post-judgment interest, and costs of suit. Orig. Pet. ¶¶ 2, 14, 17, Prayer; 1st Amend. Pet. ¶¶ 2, 12, Prayer.

**C. NGL Permian's Notice**

[¶ 6] On the day after Black Mountain filed its first amended petition, and without Black Mountain's agreement, NGL Permian filed its Notice. In pertinent part, NGL Permian asserts that removal is proper because the amount in controversy exceeds $10

million as required by Section 25A.004(d)(1) for the Court to exercise jurisdiction. *See* TEX. GOV'T CODE ANN. § 25A.004(d)(1) (requiring amount in controversy to exceed $10 million). Notice ¶¶ 4-5. The amount-in-controversy requirement is met, NGL Permian contends, because the life-time value of the royalties owed to Black Mountain under the interminable RA for any saltwater carried in the pipeline and for which a fee is levied easily exceeds $10 million. Notice ¶ 5.

**D. Black Mountain's Motion**

[¶ 7] Black Mountain responded by filing its Motion on April 10, 2025. Black Mountain contends that removal is improper because the amount in controversy does not exceed $10 million notwithstanding NGL Permian's assertion to the contrary. Motion at 4. Black Mountain argues that because it seeks the payment of royalties as damages for past—not future—breaches of the RA, the amount in controversy must be determined by the value of the royalties corresponding to these past breaches. Motion at 4-7. Black Mountain insists that the value of these royalties, calculated from the inception of the RA to the date suit was filed and based on the actual volume of saltwater transported over this time, is—and can never be more than—$4,422,789.15 as established in its jurisdictional evidence. Motion at 3, 7-8.

**E. NGL Permian's response**

[¶ 8] In its response, NGL Permian counters that the amount in controversy exceeds $10 million primarily because Black Mountain's circumscribed calculation of the amount in controversy does not account for disputed royalties on disposal fees. Response at 2. In support of this counterargument, NGL Permian advances the proposition that Black

Mountain's calculation is arbitrary and inconsistent with Texas and federal law. NGL Permian argues that, under Texas law, the allegations establish that the amount in controversy incudes both the damages sought and the value of the rights at stake, which include the disputed right to royalties on discarded saltwater. Response at 5-6, 10-12. NGL Permian also argues that, under federal law, for actions implicating the right to receive disputed funds, the amount in controversy encompasses the entire amount the plaintiff would ever be entitled to receive, including any amount due in the future. Response at 5-6, 12-14.

**F. Black Mountain's reply**

[¶ 9] In its reply, Black Mountain argues that NGL Permian has not controverted Black Mountain's evidence establishing that the amount in controversy is—and can never be more than—$4,422,789.15. Reply at 1-2, 4. Black Mountain also argues that, because it is not seeking anything more than its claim for past damages, the amount in controversy does not include the unpled theoretical value of other rights at stake and royalty payments in the future. Reply at 2-7.

## II. AMOUNT IN CONTROVERSY

[¶ 10] As the party seeking removal, NGL Permian bears the burden of establishing the Court's jurisdiction over this action. *See* TEX. GOV'T CODE ANN. §§ 25A.006(d) (requiring existence of jurisdiction to effectuate removal), (f) (requiring party seeking removal to establish jurisdiction over action); *see also* TEX. R. CIV. P. 355(b)(2)(A) (requiring party seeking removal to establish authority to hear action). NGL Permian asserts that the Court has jurisdiction over this action pursuant to Section 25A.004(d)(1).

Whether the Court has jurisdiction as asserted by NGL Permian is ordinarily a question of law for the Court to decide. *C Ten 31 LLC ex rel. SummerMoon Holdings LLC v. Tarbox*, 2025 Tex. Bus. 1, ¶ 9, 708 S.W.3d 223, 230 (3rd Div.).

**A. The Court has jurisdiction pursuant to Section 25A.004(d)(1) only if the amount in controversy exceeds $10 million, a determination made by looking at the pleadings and jurisdictional evidence, if any, and asking what the parties seek to recover**

[¶ 11] Section 25A.004(d)(1) provides that, in an action arising out of a qualified transaction, the Court has jurisdiction if the amount in controversy exceeds $10 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs. TEX. GOV'T CODE ANN. § 25A.004(d)(1).

[¶ 12] In the jurisdictional context, the amount in controversy in an action is the sum of money or the value of the thing originally sued for. *Tune v. Tex. Dep't of Pub. Safety*, 23 S.W.3d 358, 361 (Tex. 2000) (quotation marks omitted); *C Ten*, 2025 Tex. Bus. 1, at ¶ 32, 708 S.W.3d at 237 (internal citation and quotation marks omitted). The amount in controversy is frequently determined by the damages sought, but that is not always so if there are other privileges or rights at stake, the good-faith value of which meet the requisite amount in controversy. *Tune*, 23 S.W.3d at 361-62; *C Ten*, 2025 Tex. Bus. 1, at ¶¶ 20, 32-37, 708 S.W.3d at 233, 237-39. The proper inquiry is to ask what the parties seek to recover, not what they will recover or are likely to recover, when the pleadings are filed. *See United Servs. Auto. Ass'n v. Brite*, 215 S.W.3d 400, 402-03 (Tex. 2007).

[¶ 13] In determining whether a party has borne its burden of establishing that the amount in controversy falls within the Court's jurisdiction, the Court employs the following burden-shifting standard governing amount-in-controversy disputes:

First, when the plaintiff's petition alleges the amount in controversy, that pleading controls unless (a) a party presents evidence that the amount pleaded is falsely asserted to wrongly obtain or avoid jurisdiction, or (b) a different amount in controversy is readily established, such as by statutorily set fees.

Second, when the plaintiff's pleadings are silent as to whether the amount in controversy falls within this Court's jurisdiction, but a removing party's notice of removal properly pleads that the amount is within the Court's jurisdiction, those pleadings will be given the same deference in the remand analysis: they will control absent the circumstances described in (a) or (b) above.

Third, in either case, if a party presents evidence demonstrating that the amount in controversy is outside the Court's jurisdiction, the Court will remand the case unless another party presents controverting evidence that, at a minimum, raises a fact issue. And if there is a fact issue, the party asserting jurisdiction will bear the burden of proof on the issue at trial.

*C Ten*, 2025 Tex. Bus. 1, at ¶¶ 49-51, 708 S.W.3d at 243 (internal citations omitted).

## B. NGL Permian has not borne its burden to establish that the amount in controversy exceeds $10 million

[¶ 14] NGL Permian asserts that it is facially apparent from the allegations in the pleadings that "the value of the royalties on all third-party agreements to which Black Mountain claims it is entitled 'exceeds $10 million.'" Notice ¶ 5. In so asserting, NGL Permian argues that, under the *C Ten* burden-shifting standard, the inquiry begins and ends with the pleadings because there is no evidence controverting the allegations that royalties on disposal activities would be worth well more $10 million. Response at 12. According to NGL Permian, the uncontroverted allegations in the pleadings establish that there is more at stake than $4,422,789.15. Response at 11. NGL Permian is mistaken.

### 1. The amount in controversy is the past damages for unpaid royalties sought by Black Mountain

[¶ 15] The amount in controversy in this action is the sum of money sought by Black Mountain, the only party seeking to recover anything. Black Mountain has not requested a declaratory judgment or any other form of prospective relief. NGL Permian has not filed a counterclaim seeking declaratory relief, a sum of money, or the value of a right or privilege. The sum of money sought by Black Mountain corresponds to the actual damages sought by Black Mountain. These actual damages, according to the allegations in the first amended petition, exceed $1 million and equal the amount of unpaid royalties of $0.03 per barrel of saltwater transported for third parties unaffiliated with NGL Permian through the pipelines subject to the RA.

[¶ 16] The actual-damage allegations comport with the RA's terms. Under the RA, NGL Permian has an obligation to pay royalties on volumes of product[2] that it has transported through the pipelines covered by the RA and for which it has received a transportation fee. And this obligation to pay royalties on such transported saltwater is periodic as established by the RA's accounting and audit provision. This provision contemplates periodic payments due during the course of the agreement by: (1) requiring, upon first royalty payment and quarterly thereafter, NGL Permian to account for barrels transported and gross amounts billed for transported product in the previous quarter; and (2) conferring upon Black Mountain, once every year, the right to audit royalty records and receive prompt reimbursement of underpayments disclosed by an audit.

---

[2] Produced water is saltwater or wastewater. Response, at 5, 7 n.1.

[¶ 17] By the RA's very terms, the royalties due are based on the number of barrels of saltwater transported in the pipelines, a number not known until the flow has been measured, a backwards-looking calculation impacting the periodic royalty owed. And, here, Black Mountain has filed an action seeking reimbursement for the non-payment of the periodic royalties already accrued and owed. By bringing a breach-of-contract claim against NGL Permian for failure to make periodic payments due and owing under the RA for volumes of saltwater already transported through the pipeline, Black Mountain is seeking recovery for past damages—the royalties owed on those completed volumes. *See Lyle v. Jane Guinn Revocable Tr.*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (concluding that cause of action accrued monthly for unpaid royalties due under a lease requiring monthly accounting and royalty payments); *Harrison v. Bass Enters. Prod. Co.*, 888 S.W.2d 532, 537 (Tex. App.—Corpus Christi–Edinburg 1994, no writ) (concluding that cause of action accrued monthly for unpaid royalties due under a division order requiring monthly royalty payments). The allegations in Black Mountain's petition establish that it is not seeking to recover anything other than past damages for breaches of the RA that have already occurred. The allegations do not establish that Black Mountain is seeking future damages or to protect nonmonetary privileges or rights such as declaratory or injunctive relief.

### 2. Black Mountain's evidence establishes that the amount in controversy is no more than $4.5 million

[¶ 18] Of course, Black Mountain's petition is silent as to whether the amount in controversy falls within the Court's jurisdiction. The allegation that actual damages exceed

$1 million pursuant to Rule 47's requirement to specify the range of damages does not establish that the amount in controversy exceeds $10 million. *See C Ten*, 2025 Tex. Bus. 1, at ¶¶ 35, 53, n.68, n.108, 708 S.W.3d at 238, 244, n.68, n.108; TEX. R. CIV. P. 47(c). Equally, the allegation that actual damages exceed $1 million does not establish that the amount in controversy is outside the Court's jurisdictional limits either because the amount is incalculable based on the information in the petition.

[¶ 19] In contrast to Black Mountain's petition, NGL Permian's Notice is not silent as to whether the amount in controversy falls within the Court's jurisdiction. NGL Permian alleges in its Notice that the amount in controversy exceeds $10 million. But the inquiry does not end there as NGL Permian contends. Under the *C Ten* burden-shifting standard, a party can present evidence demonstrating that the amount in controversy is outside the Court's jurisdiction, irrespective of whether the parties' pleadings allege that the amount in controversy falls within the Court's jurisdiction or are silent on the matter. And, if a party presents evidence demonstrating that the amount in controversy is outside the Court's jurisdiction, the opposing party must present controverting evidence that, at a minimum, raises a fact issue to avoid remand. Black Mountain has presented evidence demonstrating that the amount in controversy is outside the Court's jurisdictional limits, meaning that the burden has shifted to NGL Permian to present controverting evidence raising a fact issue to avoid remand.

[¶ 20] Black Mountain's evidence establishing that the amount in controversy is outside the Court's jurisdictional limits is the declaration executed by its chief financial officer and custodian of records, Jacob Smith, on April 10, 2025. Motion Exh. A ¶ 2. In his

declaration, Smith avers, in essence, that the amount in controversy is the value of the royalties owed on the number of unpaid barrels of saltwater transported from the date the RA was signed to the date the action was filed: $4,422,789.15—calculated by multiplying the royalty ($0.03) times the number of barrels (147,426,305). Motion Exh. A ¶¶ 3-4. Smith explains how this amount was computed based on the data and reasonable extrapolations from the data in the records NGL Permian provided to Black Mountain. These records, according to Smith, disclosed that NGL Permian: (1) transported 144,404,830 barrels of saltwater for third parties in the pipelines covered by the RA during the period between January 11, 2019, and December 31, 2024; (2) paid the $0.03 royalty on 22,102 of these barrels but not on the remaining 144,382,728 barrels; and (3) never transported more than 3,043,577 barrels in any month between August 2020 and December 2024. Motion Exh. A ¶¶ 3-4. These figures lead Smith to conclude that:

> …if the evidence shows NGL Permian owes a royalty on all of those [remaining] barrels (144,382,728), and if NGL Permian also transported a monthly volume of 3,043,577 barrels in January 2025, the maximum royalty owed by NGL Permian for failure to pay royalties between January 2019 and February 2025 on 147,426,305 barrels of product is $4,422,789.15.

Motion Exh. A ¶ 4. When read in conjunction with Black Mountain's allegations in its first amended petition, this evidence establishes that the amount in controversy in this action is no more than $4.5 million because it is based on the total volume of unpaid saltwater transported in the pipeline from the date the RA was signed to the date the action was filed.

**3. NGL Permian has not submitted controverting evidence raising a fact issue on the amount in controversy**

[¶ 21] Because Black Mountain has presented evidence establishing that the amount in controversy is outside the Court's jurisdictional limits, NGL Permian bears the burden to present controverting evidence raising a fact issue to avoid remand. But NGL Permian has not presented such evidence notwithstanding its assertion that Black Mountain bore the burden to present evidence controverting NGL Permian's allegations that royalties on disposal activities would exceed $10 million.

[¶ 22] The evidence attached to NGL Permian's Notice consists of the PSA, RA, a docket sheet, a service request form, the return of service, the original petition, the first amended petition, and a comparison of the original and first amended petitions. Notice Exhs. A-H. The evidence attached to NGL Permian's response consists of the PSA, RA, Black Mountain's federal complaint, and certain emails between the parties' attorneys. Response Exhs. 1-5. The federal complaint, like the original and first amended petitions, seeks recovery of actual damages in excess of $1 million, and, like those petitions, does not establish that the amount in controversy exceeds $10 million. Response Exh. 3. The emails between the parties' attorneys, from February 10, 2025, and March 4, 6, and 9, 2025, concern Black Mountain's dismissal of its federal complaint, its inquiry as to NGL Permian's basis for removing the action to the Court, and its objection to removal. Response Exhs. 4-5. In explaining the basis for removal, NGL Permian's counsel stated that the amount-in-controversy requirement was met because "[b]ased on the allegations in the [p]etition, it appears that Black Mountain is seeking relief that would exceed [$10 million]." Response Exh. 4.

[¶ 23] But counsel's interpretation of Black Mountain's allegations is not evidence establishing that Black Mountain seeks more than $10 million in relief. And none of NGL Permian's evidence challenges Black Mountain's evidence that the amount in controversy is the value of the royalties owed on the number of unpaid barrels of saltwater transported from the date the RA was signed to the date the action was filed. There are no declarations or affidavits controverting the volumes of saltwater transported[3] or the amounts due on such volumes or calculating the value of future royalty payments. There is simply no evidence supporting NGL Permian's assertion that the amount in controversy exceeds $10 million. *See ET Gathering & Processing LLC v. Tellurian Prod. LLC*, 2025 Tex. Bus. 11, ¶¶ 8-11, 709 S.W.3d 1, 4-5 (11th Div.) (denying plea to the jurisdiction challenging amount in controversy because, in the absence of evidence supporting argument that petition was a sham, the petition's allegations were determinative); *Atlas IDF, LP v. NexPoint Real Est. Partners, LLC*, 2025 Tex. Bus. 16, ¶¶ 40-51, 2025 WL 1381574, at *5-6 (1st Div.) (denying plea to the jurisdiction challenging amount in controversy because the amount sought under the pleadings when the suit was commenced established jurisdiction).

**4. NGL Permian's arguments are unavailing**

[¶ 24] NGL Permian advances three arguments in support of its contention that the amount in controversy exceeds $10 million despite Black Mountain's evidence to the contrary that unpaid royalties on transported saltwater would not exceed $4.5 million. The

---

[3] Indeed, NGL Permian admits that it transports roughly three million barrels of saltwater through the pipeline system every month. Response, at 5, 7 n.1.

first argument is that the amount in controversy exceeds $10 million because the full amount encompasses actual damages and the value of the right to receive all life-time royalties on discarded saltwater. The second argument is that the amount in controversy exceeds $10 million because the controlling authority does not support Black Mountain's narrow view of the amount in controversy. And the third argument is that the amount in controversy exceeds $10 million because Black Mountain refused to stipulate that it was seeking less than $10 million. Each argument is unavailing.

### a. The amount in controversy does not include the value of the purported right at stake to receive disputed life-time royalties on discarded saltwater

[¶ 25] NGL Permian makes much ado about the theoretical recovery of royalties on discarded saltwater, arguing that the amount in controversy is greater than the actual damages sought by Black Mountain because the right to receive disputed life-time royalties on discarded saltwater is purportedly at stake. According to NGL Permian, Black Mountain placed the right to royalty payments for discarded saltwater at stake by bringing suit to enforce its right to receive any payments under the RA. In support of its argument, NGL Permian cites *C Ten* and *Dardovitch v. Haltzman*, 190 F.3d 125 (3rd Cir. 1999). NGL Permian relies on *C Ten* for the proposition that the amount in controversy includes the value of the rights at stake, and on *Dardovitch* for the proposition that the amount in controversy necessarily includes any future payments where the right to all payments is disputed. NGL Permian's reliance on these cases is misplaced. Because Black Mountain's breach-of-contract claim for past damages is not similar to the claims in *C Ten* and *Dardovitch*, these cases are inapposite.

[¶ 26] In *C Ten*, the plaintiff sued for declaratory and injunctive relief, not actual damages. *C Ten*, 2025 Tex. Bus. 1, at ¶¶ 3-6, 708 S.W.3d at 228-29. Thus, in determining the amount in controversy, the Court had to consider the value of the thing sued, not a sum of money. *C Ten*, 2025 Tex. Bus. 1, at ¶ 32, 708 S.W.3d at 237. Citing *Tune*, the Court held that the value of the thing sued for when an action is brought to protect a right or privilege is the subjective good-faith value of the rights at issue, which there involved declaratory and injunctive relief implicating the value associated with managerial control of a business. *C Ten*, 2025 Tex. Bus. 1, at ¶¶ 35-37, 708 S.W.3d at 238-39.

[¶ 27] But here, unlike *C Ten*, the claim is for a discrete amount of money, not for declaratory and injunctive relief, and the only "thing" Black Mountain sued for is valued below the Court's minimum jurisdictional threshold. Because Black Mountain is not suing on additional rights or privileges in this action, the amount in controversy is measured by the actual damages sought by Black Mountain.

[¶ 28] In *Dardovitch*, the plaintiff sued to recover trust funds, and the co-trustees defended by denying that the plaintiff was a trust beneficiary. 190 F.3d 125, at 130, 133. The plaintiff sought the amount presently due to him, which was about $34,000, but his entire interest in the trust was $104,000. *Id.* at 135. The court held that the amount in controversy was the plaintiff's entire interest, not the amount presently due to him, reasoning that, because the plaintiff's status as a trust beneficiary was in issue, the entire amount to which the plaintiff would ever be entitled under the trust was in controversy. *Id.* at 130, 135-36. In so holding, the court distinguished the plaintiff's interest from that of a party seeking payment of money as part of an ongoing and continually accruing obligation,

such as an installment contract, for which the amount in controversy is ordinarily limited to the amount due and owing when the action is filed. *Id.* at 135.

[¶ 29] But here, unlike *Dardovitch*, there has been no repudiation of the right to receive any and all payments under the RA that would require the Court to consider the value of Black Mountain's entire interest in the RA in determining the amount in controversy. NGL Permian has merely alleged that Black Mountain would not be entitled to royalties on discarded saltwater under the RA; NGL Permian has not sought rescission of the RA or challenged Black Mountain's right to receive royalties on transported water under the RA. In fact, Black Mountain relies on the RA's audit provision for its affirmative defense of contractual exclusion of remedy. And Black Mountain has not put into controversy the amount of all payments that could ever come due under the RA by seeking payment of past and future royalties. Instead, Black Mountain's claim is for payment of money as part of an ongoing and continually accruing obligation, *i.e.*, the periodic royalty payments under the RA. Thus, in determining the amount in controversy, the Court's review is limited to the amount due and owing on Black Mountain's contractual past-due royalties claim when the action was filed.

### b. NGL Permian's interpretation of controlling authority does not support the conclusion that the amount-in-controversy requirement has been met

[¶ 30] NGL Permian argues that the cases cited by Black Mountain, including *C Ten*, support a view of the amount in controversy broader than Black Mountain's novel and narrow view. Response, at 14-15. In so arguing, NGL Permian agrees that, to some extent, these cases control but disagrees on their interpretation. For example, NGL Permian insists

that *C Ten* requires the amount in controversy to include the value of the rights at stake; that *Brite* rejects the view that the amount in controversy is limited solely to those amounts that the plaintiff is likely to recover; and that *Lyle* and *Harrison*, though relevant in holding that a claim for breach of royalty does not accrue until the royalty is owed, are irrelevant in valuing the right to recover a new royalty on discarded water. The Court has considered NGL Permian's arguments based on NGL Permian's interpretation of these cases and its reliance on other cases, and for the reasons explained above and below, has not been persuaded by NGL Permian's reasoning.

### c. There is no fact issue on jurisdiction solely because Black Mountain has refused to stipulate to an amount below the jurisdictional limit

[¶ 31] NGL Permian contends that Black Mountain's refusal to stipulate to an amount below the jurisdictional limit prevents remand because, by refusing to so stipulate, Black Mountain, as the party challenging jurisdiction, has not borne its burden to disprove jurisdiction and, instead, has created a fact issue on jurisdiction.[4] Response, at 15-16. But Black Mountain's contention is belied by Black Mountain's jurisdictional evidence establishing that the amount in controversy is no more than $4.5 million. Because NGL Permian did not controvert Black Mountain's evidence, there is no fact issue on jurisdiction preventing remand. In any event, Black Mountain's purported refusal to stipulate to an amount below the jurisdictional limit would not by itself create a fact issue on jurisdiction sufficient to prevent remand. As noted by NGL Permian, even though the refusal to

---

[4] NGL Permian has not presented evidence of Black Mountain's outright refusal to stipulate to an amount in controversy below the jurisdictional limit. Instead, Black Mountain has presented evidence of Black Mountain's non-responsiveness to NGL Permian's request to so stipulate. Response Exh. 4.

stipulate to an amount below the jurisdictional limit suggests that the amount in controversy has been met, refusal is merely one factor to be considered in determining whether the amount in controversy has been met. *See, e.g., Johnson v. Dillard Dept. Stores, Inc.*, 836 F. Supp. 390, 394-95 (N.D. Tex. 1993) (holding that, although refusal to stipulate alone is not reason enough to deny remand, it was one of many factors, including the allegation of multiple harms and admission of potential damages near the amount in controversy, in favor of denying remand); *Cox v. Liberty Mut.*, 2011 WL 98374, at \*2-3 (N.D. Tex. Jan. 12, 2011) (holding that refusal to stipulate was an insufficient basis to remand given that plaintiff did not allege multiple harms or that damages could be as much as the amount in controversy but sought only economic damages of $348).

### III. CONCLUSION

[¶ 32] Consistent with this Opinion, the Court **GRANTS** the Motion and **REMANDS** the action to the 342nd Judicial District Court of Tarrant County, Texas. *See* TEX. GOV'T CODE ANN. § 25A.006(d) (action must be remanded to the court in which the action was originally filed); TEX. R. CIV. P. 355(f)(1) (same).

**IT IS SO ORDERED**.

JERRY D. BULLARD
Judge of the Texas Business Court,
Eighth Division

SIGNED ON: June 30, 2025